[No. C024898. Third Dist. Oct. 21, 1997.]

DEPARTMENT OF SOCIAL SERVICES, Petitioner, v.
THE SUPERIOR COURT OF SISKIYOU COUNTY, Respondent;
SISKIYOU COUNTY CHILD PROTECTIVE SERVICES et al., Real
Parties in Interest.

[No. C025067. Third Dist. Oct. 21, 1997.]

In re THEODORE D. et al., Persons Coming Under the Juvenile Court
Law.
DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Appellant, v.
JENNIFER DEVINE, as Court Appointed Special Advocate, etc.,
Defendant and Respondent.

722

**COUNSEL**

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Charlton G. Holland III, Assistant Attorneys General, Dennis Eckhart and Frank S. Furtek, Deputy Attorneys General, for Plaintiff and Appellant and for Petitioner.

Michael D. Thamer for Defendant and Respondent and for Real Parties in Interest.

No appearance for Respondent.

Don Langford, County Counsel, for Real Parties in Interest.

Janet H. Saalfield, under appointment by the Court of Appeal, for Minors.

## OPINION

**SCOTLAND, J.**—In this consolidated appeal and petition for writ of mandate, we address whether the juvenile court has authority to independently determine the appropriate interim placement of minors pending their adoption after the court has terminated parental rights and referred the minors to the Department of Social Services (DSS) for adoptive placement, or whether DSS has the sole authority to determine such placement, subject only to judicial review for abuse of discretion.

We agree with DSS that the juvenile court erred in ordering the agency to move the minors, Theodore D. and Katelin D., from the placement selected by DSS to one chosen by the court.

■ As we shall explain, the Legislature has granted the agency to which a minor is referred for adoption, in this case DSS, the "exclusive" custody, control and supervision of the minor referred for adoptive placement. (Welf. & Inst. Code, § 366.26, subd. (j); Fam. Code, § 8704.) This exclusive authority includes the "discretion" to place the minor in, and if necessary remove the minor from, a prospective adoptive home or "temporary care," i.e., foster care placement for the minor pending adoptive placement. (Fam. Code, § 8704.) Under the statutory scheme, DSS's discretion regarding adoptive and interim foster care placement is not unfettered. The juvenile court retains jurisdiction over the minor to ensure the adoption is completed as expeditiously as possible and to determine the "appropriateness of the placement." (Welf. & Inst. Code, § 366.3) This does not mean the court may substitute its independent judgment for that of DSS because the Legislature has given the agency exclusive custody and control of the minor and the discretion to make placement decisions. Rather, the court is limited to reviewing whether DSS abused its discretion in placing the minor or in determining that the placement, once made, remains appropriate. Absent a

showing that DSS's placement decision is patently absurd or unquestionably not in the minor's best interests, the court may not interfere and disapprove of the placement.

Because the record shows DSS did not abuse its discretion in placing the minors in the Culver family home, the court erred in "vetoing" DSS's placement decision.

## FACTS

Theodore D. and Katelin D., and their older siblings, Diana B., Sacha B. and Jasmine D., were declared dependent children of the juvenile court and were removed from parental custody. The Siskiyou County Human Services Department placed Theodore and Katelin with the Bringles. Diana, Sacha and Jasmine were placed with the Stocktons.

When the children's parents failed to cooperate and avail themselves of reunification services, the court terminated those services and scheduled a hearing to determine the appropriate permanent plan for the minors. (Welf. & Inst. Code, § 366.26; further section references are to the Welfare and Institutions Code unless otherwise specified.)

Following the section 366.26 hearing, the court found that Theodore and Katelin were likely to be adopted, terminated parental rights, and ordered a permanent plan of adoption for them. The court found that it was unlikely Diana, Sacha and Jasmine would be adopted, and thus ordered long-term foster care for these siblings.

The court directed DSS to place Theodore and Katelin for adoption and ordered the Siskiyou County Human Services Department to place Diana, Sacha and Jasmine in suitable long-term foster care. Finding sibling visitation was in the children's best interest, the court ordered that such visitation "be allowed and encouraged to take place to the greatest extent possible taking into account circumstances of the foster and/or adoptive parents, including time, distance, expense, etc."

Placement of Theodore and Katelin continued with the Bringles; Diana, Sacha and Jasmine remained with the Stocktons.

At a review hearing, the court appointed special advocate (CASA) urged the juvenile court to order DSS to move Theodore and Katelin to the Stocktons' home pending adoptive placement. According to CASA, (1) the Bringles were not providing the disciplined environment needed by the minors and had been ruled out as adoptive parents, (2) the Stocktons were "interested in having Theodore and Katelin placed with them, not just as

foster children, but to adopt them," and (3) Diana, Sacha and Jasmine wanted to maintain contact with their siblings and, although Theodore and Katelin were too young to "understand that the three girls are their sisters," it would be in their best interest to place them with the Stocktons because this would allow all the children to remain together as a family.

DSS acknowledged it was not considering the Bringles as an adoptive home for Theodore and Katelin. Nevertheless, DSS intended to continue this placement pending identification of an appropriate adoptive family. Referring to an assessment which reported that Theodore and Katelin "seem[ed] to be secure in the [Bringles's] home" where they had been living for most of the past two years, and that an "adjustment" in placement would be "difficult for the children," DSS opined that it was in the minors' best interest not to be moved from the Bringles pending placement with an adoptive family.

The question then arose whether the juvenile court had power to direct DSS to place Theodore and Katelin with the Stocktons pending adoption, or whether DSS had exclusive authority to determine preadoptive placement. The matter was taken under submission by the court, which ordered that the minors "shall remain within the jurisdiction of State Adoptions and *in the Bringle home*" until the court's ruling. (Italics added.)

Before the court ruled on the submitted matter, a petition was filed pursuant to section 388 to modify the court's order specifying that Theodore and Katelin shall remain in the Bringle home until the ruling. According to a DSS adoptions caseworker, the Bringles no longer were able to cope with the minors' "escalating behavior," which included fighting, biting and screaming. DSS intended to move Theodore and Katelin to another family which could provide consistent care for the minors' special needs pending adoption. While DSS ordinarily would have considered this to be a "lateral move" that it could make "unilaterally," the petition for modification was filed in this case simply because "we have a court order that specifically states these children will not be moved from a certain home until further court order," an order DSS did not want to flout.

At the hearing on the petition, CASA agreed the order should be vacated and again urged the juvenile court to direct DSS to place Theodore and Katelin with the Stocktons. In CASA's view, the court had the authority to supervise and regulate DSS's decisions on preadoptive placements and thus could order a placement other than that selected by DSS. DSS disagreed, reasserting that it had exclusive authority to make preadoptive placements after the court terminated parental rights and referred the minors to DSS for adoptive placement. Although DSS was "not necessarily opposed to adoption by the Stocktons," it was pointed out that the Stocktons had "not set in

motion formally all the mechanisms to kick in the review of them as a potential adoptive home [for Theodore and Katelin]." In addition, a concern was expressed that placing two more young children with the Stocktons might make it more difficult for them to care for the foster siblings who exhibit physical and emotional problems.

The court vacated the order specifying that Theodore and Katelin shall remain in the Bringle home pending a ruling on the previously submitted issue. However, the court declined to rule on CASA's request; instead, it continued the matter for a status review and further proceedings on the questions whether the court had authority to direct DSS to place the minors with the Stocktons and, if so, whether it should do so.

In later ruling on the submitted matter, the court held it had "jurisdiction to tell [DSS] what to do" with respect to preadoptive placement. For this proposition, it cited "the overall Welfare and Institutions Code, and specifically [section] 202[, subdivision (d)], that [the court] must act in the best interests of the children."[1] It acknowledged that section 366.26, subdivision (j) gives DSS "exclusive care and control" of the minors who had been declared free from parental custody and been referred for adoptive placement. The court stated, however, that other sections required it to retain jurisdiction over the minors and, in doing so, it "[did] not prefer to be a puppet."

Accordingly, the court indicated it would "receive all the information from the various parties and the various agencies that are involved. And if the court feels that [DSS] is not proceeding appropriately in placement of the children, then the court will exercise veto power over what [DSS] proposes to do and may order [DSS] to place the children elsewhere."

The court granted DSS's request for a continuance to prepare for an evidentiary hearing on the appropriate placement and ruled that, pending the hearing, DSS could place Theodore and Katelin in any home DSS felt would most benefit the children. DSS chose the Culvers, who had been a successful foster family for over five years.

DSS then filed a writ petition with this court and requested a stay of the evidentiary hearing, arguing the juvenile court usurped DSS's authority

---

[1]Section 202, subdivision (d) provides: "Juvenile courts and other public agencies charged with enforcing, interpreting, and administering the juvenile court law shall consider the safety and protection of the public and the best interests of the minor in all deliberations pursuant to this chapter. Participants in the juvenile justice system shall hold themselves accountable for its results. They shall act in conformity with a comprehensive set of objectives established to improve system performance in a vigorous and ongoing manner."

under section 366.26, subdivision (j) when the court ruled that it, and not DSS, would decide the appropriate placement of minors. We issued an alternative writ of mandate, but denied the request for a stay of the evidentiary hearing.

At the evidentiary hearing, the parties stipulated that the Bringle home no longer was appropriate for the minors. The court also was made aware that the minors' sister, Diana, had moved from the Stocktons' residence to the home of her father. The court stated that, because DSS had exclusive custody and control of the minors, a presumption existed that DSS's recommendation regarding placement was correct and CASA had the burden of proving otherwise. The following evidence was adduced at the hearing.

DSS adoptions caseworker Karen Baily, a licensed clinical social worker, testified that Theodore had been diagnosed with reactive attachment disorder, which meant he has difficulty bonding, has poor impulse control, and is insensitive to the needs of others. Because of this disorder, and based upon her experience with the minors, Baily opined that Theodore and Katelin need a home with flexibility and reasonable expectations of them as well as a family with no close-in-age children to deflect attention from the minors, who need substantial attention and a structured environment.

Baily and DSS were concerned about the Stocktons' ability to parent Theodore, Katelin, and their siblings because Jasmine and Sacha also were overcoming emotional and behavioral problems, including attachment disorder and sexual acting out. In DSS's view, this would affect the amount of individual attention the Stocktons could give to Theodore and Katelin. Furthermore, DSS was concerned about the emotional demands that Jasmine and Sacha would place on Theodore and Katelin who, due to their young age when they were removed from their parents' home, did not understand that Jasmine and Sacha are their sisters. Bailey felt Theodore and Katelin needed an emotionally neutral environment in order to stabilize after problems which had occurred at the Bringles.

For these reasons, DSS had placed Theodore and Katelin with the Culvers, who Baily believed could best meet the minors' needs. The Culvers were known to DSS, which had worked with them in the past and had been successful in using their home for transitioning children into eventual adoptive placement. The Culvers provided nurturing and firm limits, which are essential for the minors. Furthermore, the Culvers were not responsible for any young children, which would enable them to devote their full attention to the minors. The Culver home provided an emotionally neutral environment with no investment in adopting Theodore and Katelin, thereby allowing the minors to stabilize emotionally.

CASA presented evidence that the Stocktons had done an admirable job with Sacha and Jasmine, as well as Diana before she moved in with her father.

Dolores Williams, the counselor for Jasmine and Sacha, testified the Stocktons were a "quality family" with numerous hours of training on how to care for children who have attachment disorder and children who have been the victims of sexual abuse. According to Williams, Jasmine and Sacha were grieving the loss of their siblings and wanted to recreate their family unit. Williams opined that it would be therapeutic for them to have Theodore and Katelin placed in the same home, and that the Stocktons could handle and effectively parent all of the children. Although Sacha and Jasmine masturbated on occasion when under stress, they had not acted out sexually on each other and would not be a threat to Theodore and Katelin.

On cross-examination, Williams, who has a master's degree in counseling but was not licensed, conceded she had the authority to recommend foster care placements but not adoptive placements. She admitted that Sacha's and Jasmine's need for contact with Theodore and Katelin could be met through frequent and ongoing visitation. Williams had spent one and a half hours evaluating Theodore, had never evaluated Katelin, and had spent a total of eight to ten hours with the two minors. She agreed that, in order to determine the best interests of Theodore and Katelin, she would need to evaluate them on an extended long-term basis. She also acknowledged that her testimony primarily addressed Sacha's and Jasmine's needs. Williams said she would not be willing to sacrifice the best interests of Theodore and Katelin in favor of Jasmine and Sacha, but stated that, if a qualified person who was better acquainted with Theodore and Katelin testified it would be harmful to place them with the Stockton family, Williams would defer to that opinion.

Kathy Stockton testified she was willing to adopt the four children and stated she was capable of caring for all of them. When asked about her back surgeries in 1993 and 1995, she indicated they were successful and her back condition would not hamper her from being able to physically care for the children.

DSS responded that it was not ruling out placement of Theodore and Katelin with the Stocktons. However, given the Stocktons' interest in adopting, DSS wanted to do an adoptive home study first. DSS explained that adoptive placement is scrutinized more acutely than foster care placement; the fact that people are qualified as foster parents does not mean they necessarily would be approved as adoptive parents.

In DSS's view, it was too risky to place Theodore and Katelin with the Stocktons on a trial basis pending the adoptive home study. If the placement

did not work out or if the Stocktons were not approved as adoptive parents, it would be more damaging emotionally to remove the minors from the home and separate the siblings once again—a concern that did not exist if the Culver placement did not work out.

DSS's witnesses agreed that siblings generally should be kept together if possible, but noted that the best interests of individual children could dictate otherwise. DSS believed it was not sufficient that Dolores Williams felt placing Theodore and Katelin with the Stocktons would be optimal for the minors. According to Constance Lathrop, a supervisor with Siskiyou County Human Services, she had worked with Williams for many years and learned that Williams was not able to assure the best needs for adoptive children. Williams previously had suggested foster placements with people who wished to adopt, and the placements had not worked out. Furthermore, by her own admission, Williams was more familiar with the needs of Jasmine and Sacha than those of Theodore and Katelin.

DSS also wanted to ensure that Mrs. Stockton's back injury was healed as successfully as she indicated, but it had not yet seen a medical report to this effect. In addition, DSS wanted to make sure that Jasmine's and Sacha's sexual acting out would not be directed toward the minors. An adoptive home study would provide the information DSS needed regarding these matters and the Stocktons's ability to parent four emotionally needy children. Until completion of the home study, supervised visits between the siblings would enable them to maintain contact without placing undue emotional burdens on Theodore and Katelin.

Citing section 366.3, subdivision (e)(1) and (e)(4), the juvenile court ruled that the current placement of the children with the Culvers was not appropriate and that the proposed services to the children were not adequate.[2] The court ordered DSS to place Theodore and Katelin with their siblings in the Stocktons' home until an adoptive home study was completed and adoptive placement was identified. The court noted it was not dealing merely with the best interest of Theodore and Katelin; rather, the best interest of all of the siblings was at issue. Citing section 16002 as an indication of the Legislature's intent to have siblings placed together whenever possible, the court

[2]In so ruling, the juvenile court acknowledged DSS's expertise but questioned the agency's motives when: (1) DSS represented that the Bringle home was still a viable placement but then removed the minors to respite care only three weeks later; (2) DSS later moved the minors to the Culver home despite DSS's assurance that it did not want to move the minors any more than was necessary; (3) DSS previously had opposed contact between the minors and their older siblings but then indicated it was important to have regular sibling visitation; and (4) in the court's view, the tenor of DSS's referral letter for a study of the Stocktons' home went well beyond the request for an impartial home study in that the letter specified certain concerns and areas to be addressed by the study.

found that the detriment to Sacha and Jasmine if the siblings were not placed together outweighed the possible detriment to the Theodore and Katelin expressed by DSS.

The judge also noted that he was adopted himself, had raised adopted children, and could assure all the parties that a sense of family unity and sibling contact will become increasingly important as time progresses. He stated: "[I]n chapter 28 of Deuteronomy, the blessings of obedience to God are measured against the curses of disobedience. After such curses as sickness, death and even cannibalism, the ultimate curse in verse 64 is that, 'the Lord will scatter you among all peoples, from one end of the earth to the other. . . .' These siblings have been scattered and this Court has the opportunity at this point in time to reunite them. This Court . . . does not wish to have to explain to them later, why such an opportunity was ignored."

DSS filed a timely appeal from the juvenile court's "Ruling re Contested [Section] 388 petition & Status Review Hearing," in which the court directed the agency to place Theodore and Katelin in the Stockton home.

## DISCUSSION

### I

DSS contends the juvenile court erred in substituting its judgment for that of DSS and vetoing DSS's placement of Theodore and Katelin pending the filing of an adoption petition. DSS argues the Legislature has given it the exclusive care, custody and control of minors referred for adoptive placement following the termination of parental rights (§ 366.26, subd. (j)), and this encompasses interim foster care placement of the minors. DSS does not dispute that the juvenile court retains jurisdiction over the minors until they are adopted and may review the appropriateness of the minors' placement (§ 366.3, subds. (a), (d), (e)), but asserts that this does not mean the court can usurp the authority of DSS by using independent judgment to select a different foster home which the court prefers. Rather, the court must review DSS's placement decision under an abuse of discretion standard. According to DSS, no such abuse is demonstrated in the present case.[3]

The resolution of this matter turns upon the interpretation of three statutes—section 366.26, section 366.3 and Family Code section 8704. ■ In

[3]The minors claim DSS has waived the right to raise this contention on appeal because, in their view, it is inconsistent with DSS's position in the juvenile court. We disagree. Nothing in the record supports the minors' claim that DSS conceded the juvenile court had the authority and discretion to make the placement decision.

construing these sections, we look to the words of the statutes to ascertain legislative intent and effectuate the purpose of the law. (*Gooch* v. *Hendrix* (1993) 5 Cal.4th 266, 282 [19 Cal.Rptr.2d 712, 851 P.2d 1321]; *In re Heraclio A.* (1996) 42 Cal.App.4th 569, 574 [49 Cal.Rptr.2d 713].) The ordinary, commonsense meaning of the words generally applies, and the plain meaning of the language governs as the Legislature is presumed to have meant what it said. (*Lennane* v. *Franchise Tax Bd.* (1994) 9 Cal.4th 263, 268 [36 Cal.Rptr.2d 563, 885 P.2d 976]; *Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 113 [145 Cal.Rptr. 674, 577 P.2d 1014]; *Western Growers Ins. Co.* v. *Workers' Comp. Appeals Bd.* (1993) 16 Cal.App.4th 227, 240 [20 Cal.Rptr.2d 26]). When the words are clear, there is no room for interpretation. (*Rossi* v. *Brown* (1995) 9 Cal.4th 688, 695 [38 Cal.Rptr.2d 363, 889 P.2d 557]; *Western Growers Ins. Co.* v. *Workers' Comp. Appeals Bd.*, *supra*, at p. 240.)

Section 366.26, subdivision (j) provides: "If the court, by order or judgment declares the minor free from the custody and control of both parents, or one parent if the other does not have custody and control, the court shall at the same time order the minor referred to the State Department of Social Services or a licensed adoption agency for adoptive placement by the agency. However, no petition for adoption may be granted until the appellate rights of the natural parents have been exhausted. The State Department of Social Services or licensed adoption agency shall be responsible for the custody and supervision of the minor and *shall be entitled to the exclusive care and control of the minor at all times until a petition for adoption is granted*. With the consent of the agency, the court may appoint a guardian of the minor, who shall serve until the minor is adopted." (Stats. 1995, ch. 540, § 6, italics added.)

Similarly, Family Code section 8704, subdivision (a), which governs a child's adoptive placement whether the child was freed for adoption under section 366.26 or was voluntarily relinquished for adoption (*In re David H.* (1995) 33 Cal.App.4th 368, 379 [39 Cal.Rptr.2d 313]), provides: "The department or licensed adoption agency to which a child has been freed for adoption by either relinquishment or termination of parental rights is responsible for the care of the child, and is *entitled to the exclusive custody and control of the child until an order of adoption is granted*. Any placement for *temporary care, or for adoption*, made by the department or a licensed adoption agency may be terminated *in its discretion* at any time before the granting of an order of adoption. In the event of termination of any placement for temporary care or for adoption, the child shall be returned promptly to the physical custody of the department or licensed adoption agency." (Stats. 1992, ch. 162, § 10, p. 231, italics added.) Subdivision (b) of section

8704 of the Family Code provides that court approval to remove a child from the home of prospective adoptive parents is required only after a petition for adoption has been filed.

 The words of these statutes are clear. The Legislature has granted to the agency, in this case DSS, the exclusive custody, control and supervision of a child referred for adoptive placement. "Exclusive" means sole, excluding others from participation, and vested in one person alone. (Webster's New Intern. Dict. (3d ed. 1986) p. 793; Black's Law Dict. (6th ed. 1990) p. 564, col. 1.) This exclusive authority expressly includes decisions on adoptive placement as well as temporary care, i.e. foster care placement pending adoptive placement. Moreover, the Legislature explicitly has provided that, prior to the filing of a petition for adoption, the agency may change an adoptive placement at its discretion. (But see *C.V.C.* v. *Superior Court* (1973) 29 Cal.App.3d 909 [106 Cal.Rptr. 123].)

This clear grant of exclusive authority and discretion over adoptive placement and temporary care pending such placement evidences a legislative intent to defer to DSS's expertise once parental rights have been terminated and a child is referred for adoption. This deference is evidenced further by the fact that DDS's consent is necessary for the court to appoint a guardian for a minor referred for adoption. (§ 366.26, subd. (j).)

It is equally clear that, notwithstanding section 366.26 subdivision (j) and Family Code section 8704, DSS's discretion regarding adoptive placement and interim foster care placement is not unfettered because the Legislature has authorized the juvenile court to review the agency's exercise of discretion.

Section 366.3 provides in pertinent part: "(a) *If a juvenile court orders a permanent plan of adoption* or legal guardianship pursuant to Section . . . 366.26, *the court shall retain jurisdiction over the minor until the minor is adopted* or the legal guardianship is established. The status of the minor shall be reviewed every six months to ensure that the adoption or guardianship is completed as expeditiously as possible. When the adoption of the minor has been granted the court shall terminate jurisdiction over the minor. [¶] . . . [¶] (d) If the minor is in a placement other than the home of a legal guardian and jurisdiction has not been dismissed, the status of the minor shall be reviewed every six months. This review may be conducted by the court or an appropriate local agency. The court shall conduct the review under the following circumstances: [¶] (1) Upon the request of the minor's parents or guardians. [¶] (2) Upon the request of the minor. [¶] (3) It has been 12 months since a hearing held pursuant to Section 366.26 or an order that the

minor remain in long-term foster care . . . . [¶] (4) It has been 12 months since a review was conducted by the court. [¶] (e) *At the review held every six months pursuant to the subdivision (d), the reviewing body* shall inquire about the progress being made to provide a permanent home for the minor and *shall determine all of the following*: [¶] (1) *The appropriateness of the placement. . . .*" (Stats. 1996, ch. 1138, § 5, italics added.)

■ The provision for judicial review of the appropriateness of the agency's placement of the minor indicates a legislative assessment that the agency, despite its expertise, might on occasion abuse its discretion and therefore should not be given carte blanche in its placement decisions. (Cf. *C.V.C.* v. *Superior Court, supra,* 29 Cal.App.3d at pp. 917, fn. 8, 919, fn. 14.)

This does not mean the juvenile court may substitute its judgment for DSS as this would interfere with DSS's exclusive custody and control of the minor and DSS's discretion in making adoptive or temporary care placements. Read together, the statutes clearly reflect a legislative intent that the juvenile court is limited to reviewing whether DSS abused its discretion in placing the minor or in determining that the placement, once made, remains appropriate. (Cf. *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 [27 Cal.Rptr.2d 595, 867 P.2d 706].) In other words, the court must assess whether DSS acted arbitrarily and capriciously, considering the minor's best interests. (*Ibid.*) ■ Absent a showing that DSS's placement decision is patently absurd or unquestionably not in the minor's best interests, the juvenile court may not interfere and disapprove of the minor's placement, thereby requiring that the minor be relocated to another home. "In any custody determination, a primary consideration in determining the child's best interests is the goal of assuring stability and continuity." (*Id.,* at p. 317.)

II

CASA and the minors wrongly rely on *C.V.C.* v. *Superior Court, supra,* 29 Cal.App.3d 909 for the proposition that DSS's placement decisions are subject to review by the juvenile court using an independent judgment standard.

In *C.V.C.* v. *Superior Court,* the agency had removed a child from the home of prospective adoptive parents pursuant to former Civil Code section 224n, a predecessor of Family Code section 8704. (29 Cal.App.3d at pp. 912, 914.) In a mandate proceeding, this court addressed whether the due process guarantee of the Fourteenth Amendment entitled prospective adoptive parents, with whom a child had been placed by a licensed adoption

agency, to notice and hearing before the child was removed from their home; and whether judicial review of the agency's decision was to be conducted using the independent judgment standard or under the narrower inquiry of whether the agency abused its discretion. (29 Cal.App.3d at p. 912.)

At the time *C.V.C.* v. *Superior Court* was decided, former Civil Code section 224n provided in pertinent part: "The agency to which a child has been relinquished for adoption shall be responsible for the care of the child, and shall be entitled to the custody and control of the child at all times until a petition for adoption has been granted.[4] Any placement for temporary care, or for adoption made by the agency, may be terminated at the discretion of the agency at any time prior to the granting of a petition for adoption. In the event of termination of any placement for temporary care or for adoption, the child shall be returned promptly to the physical custody of the agency. [¶] No petition may be filed to adopt a child relinquished to a licensed adoption agency or a child declared free from the custody and control of either or both of his parents and referred to a licensed adoption agency for adoptive placement, except by the prospective adoptive parents with whom the child has been placed for adoption by the adoption agency. After the petition for adoption has been filed, the agency may remove the child from the prospective adoptive parents only with the approval of the court, upon motion by the agency after notice to the prospective adoptive parents, supported by an affidavit or affidavits stating the grounds on which removal is sought. If an agency refuses to consent to the adoption of a child by the person or persons with whom the agency placed the child for adoption, the superior court may nevertheless decree the adoption if it finds that the refusal to consent is not in the best interest of the child." (Stats. 1970, ch. 1091, § 1, p. 1935.)[5]

---

[4]In 1976, former Civil Code section 224n was amended to provide that the agency "shall be entitled to the *exclusive* custody and control of the child. . . ." (Stats. 1976, ch. 404, § 1, p. 1054, italics added.)

[5]The second paragraph of former Civil Code section 224n is almost identical to Family Code section 8704, subdivision (b), which provides: "No petition may be filed to adopt a child relinquished to the department or a licensed adoption agency or a child declared free from the custody and control of either or both birth parents and referred to the department or a licensed adoption agency for adoptive placement, except by the prospective adoptive parents with whom the child has been placed for adoption by the department or licensed adoption agency. After the adoption petition has been filed, the department or licensed adoption agency may remove the child from the prospective adoptive parents only with the approval of the court, upon motion by the department or licensed adoption agency after notice to the prospective adoptive parents, supported by an affidavit or affidavits stating the grounds on which removal is sought. If the department or licensed adoption agency refuses to consent to the adoption of a child by the person or persons with whom the department or licensed adoption agency placed the child for adoption, the court may nevertheless order the adoption if it finds that the refusal to consent is not in the child's best interest."

*C.V.C.* v. *Superior Court* held that prospective adoptive parents have a fundamental interest in a child placed with them, which entitles them to due process protection before the child is removed from their home. (29 Cal.App.3d at pp. 916-917.)

The court in *C.V.C.* v. *Superior Court* acknowledged that the government has a weighty interest in protecting the safety of the child and that former Civil Code section 224n was designed to elevate the placement agency's discernment of danger above the interests of the prospective parents. (29 Cal.App.3d at p. 916.) However, unlike the protection afforded by the second paragraph of former Civil Code section 224n to prospective adoptive parents after a petition for adoption had been filed (fn. 5, *ante*), the first paragraph of the statute did not require that prospective parents who had not filed an adoption petition be given notice and a hearing prior to the removal of the child from their home. (29 Cal.App.3d at p. 917.)

*C.V.C.* v. *Superior Court* determined that the constitutional entitlement of the prospective adoptive parents was no less preceding the filing of the adoption petition and that, in the absence of imminent danger to the child, the grievous loss threatening the prospective adoptive parents outweighed the state's interest in summary termination. (29 Cal.App.3d at p. 917.)

To prevent a violation of due process rights occasioned by the statutory omission of a prior administrative review hearing, *C.V.C.* v. *Superior Court* concluded that prospective adoptive parents were entitled to a trial de novo in superior court before a child was removed from their home. (29 Cal.App.3d at p. 918.)[6] Moreover, because of the fundamental interest involved, the prospective adoptive parents were entitled to judicial review of the agency's decision using the independent judgment standard. (29 Cal.App.3d at pp. 918-919; accord, *Marten* v. *Thies* (1979) 99 Cal.App.3d 161, 171 [160 Cal.Rptr. 57].)

Here, unlike in *C.V.C.* v. *Superior Court* and the other cases cited by CASA and the minors, we are not dealing with the removal of children from the home of prospective adoptive parents (*Marten* v. *Thies*, *supra*, 99 Cal.App.3d 161; *Rodriguez* v. *Superior Court* (1971) 18 Cal.App.3d 510 [95 Cal.Rptr. 923]; *Jinny N.* v. *Superior Court* (1987) 195 Cal.App.3d 967 [241 Cal.Rptr. 95] [de facto prospective adoptive parents]). Rather, the question is whether DSS appropriately placed the minors with the Culvers or whether the agency should have placed them with the Stocktons, who may become prospective adoptive parents (see Fam. Code, § 8542) but were not at the time DSS placed the minors with the Culvers.

---

[6]Administrative review is now available pursuant to the grievance procedures set forth in California Code of Regulations, title 22, sections 35233-35239.

Neither CASA nor the minors have demonstrated that the minors' relationship with their siblings is akin to a parent-child relationship, entitling them to a heightened standard of review. They have not provided any meaningful argument or authority establishing that minors, who have a permanent plan of adoption, have a fundamental right pending adoptive placement to be placed in temporary foster care with siblings who have a different permanent plan. It is their burden to establish such a fundamental right. (*Michael H.* v. *Gerald D.* (1989) 491 U.S. 110, 125 [109 S.Ct. 2333, 2343, 105 L.Ed.2d 91, 107]; accord, *Mullins* v. *State of Or.* (9th Cir. 1995) 57 F.3d 789, 794.) They have failed to do so.

Also misplaced is CASA reliance on *Guardianship of Henwood* (1958) 49 Cal.2d 639 [320 P.2d 1] for the proposition that de novo review of DSS's placement decisions is constitutionally mandated.

*Guardianship of Henwood* concerned whether, under the Probate Code and former Civil Code section 224n, the trial court had authority to appoint a guardian for a child who had been relinquished for adoption and was under the custody and control of a county adoption agency. The Supreme Court held that, in the absence of an express statutory provision depriving the trial court of its power to appoint a guardian, the adoption statutes did not preclude the court from establishing a guardianship. (49 Cal.2d at p. 644.) It stated: "We cannot assume that adoption agencies will necessarily in all cases have such wisdom and competence that they may be set apart from other custodians and given *carte blanche* in their control of relinquished children until a petition for adoption is before the court. Certainly, the Legislature would not leave such a curtailment of the court's power to be drawn by inference alone from adoption provisions that contain no reference to guardianship proceedings." (*Ibid.*)

Apparently, CASA believes *Guardianship of Henwood* shows that DSS's exclusive custody and control of minors referred for adoption is not without limits. However, the case is of no assistance to CASA's position that a juvenile court may substitute its judgment for that of DSS when the court reviews DSS's interim foster care placement decisions. First, at the time *Guardianship of Henwood* was decided, former Civil Code section 224n granted the agency custody and control of a child placed with the agency for adoption (Stats. 1957, ch. 1237, § 1, p. 2545), but not *exclusive* custody and control as provided in section 366.26, subdivision (j) and Family Code section 8704. The addition of the word "exclusive" indicates an intent to strengthen DSS's authority. Second, the Legislature now has expressly provided that the consent of DSS or the licensed adoption agency with which the child was placed for adoption is necessary for the juvenile court to

appoint a guardian (§ 366.26, subd. (j)), thereby evidencing an intent to limit the juvenile court's authority once a child is placed in the custody and control of DSS or a licensed adoption agency.

Furthermore, nothing in *Guardianship of Henwood* indicates that the juvenile court has the right to exercise its independent judgment in reviewing interim foster care placement decisions of adoption agencies or DSS. In fact, the opinion acknowledged that, in the absence of a showing the agency was unfit to have temporary custody or it was improbable that the child would be adopted, adoption procedures "would obviously be frustrated, if at any time the court could determine in the exercise of its independent judgment and discretion that a guardian should be appointed and custody removed from the agency or prospective adoptive parents selected by it." (49 Cal.2d at p. 645.)

Citing *In re Robert A.* (1992) 4 Cal.App.4th 174 [5 Cal.Rptr.2d 438] and *In re Danielle W.* (1989) 207 Cal.App.3d 1227 [255 Cal.Rptr. 344], CASA and the minors argue that our interpretation of section 366.26, subdivision (j) constitutes a violation of the separation of powers found in article III, section 3 of the California Constitution. They assert DSS is merely an "arm of the court" acting in the best interests of the minor and therefore is subject to the court's supervision.

Article III, section 3 of the state Constitution provides: "The powers of state government are legislative, executive and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." Accordingly, "[j]udicial power is in the courts and their function is to declare the law and determine the rights of parties to a controversy before the court. . . . Executive or administrative officers cannot exercise or interfere with judicial powers." (*In re Danielle W., supra,* 207 Cal.App.3d at p. 1235, citations omitted.)

CASA and the minors have failed to specify which judicial power has been usurped by DSS. By making a placement decision, DSS is not declaring the law nor is it determining the rights of the parties to a controversy. The present case is factually distinguishable from *In re Robert A.* and *In re Danielle W.,* where parental rights had not been terminated and thus the juvenile court was required to provide the parents with due process in the controversy between the state and the parents. (*In re Robert A., supra,* 4 Cal.App.4th at p. 188.) In such cases, DSS has a " 'hybrid responsibility' of representing the state in seeking the best interests of the child, while simultaneously administering the court's orders." (*Ibid.*)

Here, parental rights have been terminated as to Theodore and Katelin, and there no longer is a controversy between the state and the minors'

parents. DSS simply is exercising the exclusive power expressly granted to it by the Legislature to supervise, care for and control the minors. The juvenile court may make only those limited determinations authorized by the legislative grant of special powers. (*In re Lisa R.* (1975) 13 Cal.3d 636, 643 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017].) Although the juvenile court is responsible for overseeing DSS's exercise of its authority to place the minors so the court can ensure that DSS has not abused its discretion by making an inappropriate placement (§ 366.3, subd. (e)(1)), the court cannot substitute its judgment for that of DSS as this would contravene DSS's exclusive authority.

CASA also argues *In re Robert A.*, *supra*, 4 Cal.App.4th 174 holds that the juvenile court may direct DSS to make a particular placement. We disagree.

*In re Robert A.* construed former subdivision (b) of section 361.2 (now subdivision (e)), which provided: "When the court orders removal pursuant to section 361, the court shall order the care, custody, control, and conduct of such minor to be under the supervision of the probation officer who may place the minor in any of the following: [¶] [a list of the various types of placements that the probation officer could make]." (Stats. 1986, ch. 1122, § 12, p. 3983.) The opinion concluded ". . . the statutory scheme of the juvenile court law requires that once the court has placed the custody of the minor under the supervision of the probation officer . . . , the court retains jurisdiction to oversee the administration by the Department, in its choice among the enumerated placement alternatives in section 361.2, [former] subdivision (b), of the custody and care of the minor. *Although the court does not make a direct placement order itself, it does have the power to instruct the Department to make a particular out-of-home placement of a particular dependent child.* As an arm of the court, the Department is naturally interested in following the instructions of the court and carrying out its wishes, consistent with the exercise of its own expertise in the area, on which the court depends for guidance. As a party in the case, the Department remains subject to the juvenile court's orders. Thus, where a judicial decision such as out-of-home placement is required, the authority of Department to implement that order must necessarily be limited in particular situations, as required by the court's interpretation of the best interests of the child. (§ 202, subd. (b).)" (*In re Robert A.*, *supra*, 4 Cal.App.4th at p. 189, italics added.)

What CASA overlooks is that *In re Robert A.* involves different statutory language and a different stage of dependency proceedings. Section 361.2 directs the juvenile court to order the care, custody and control of the minor to be "under the supervision of the probation officer," who may be an employee of DSS. (Cal. Rules of Court, rule 1401(a)(12).) There is a

difference between supervising custody and having exclusive custody. In the former situation, the juvenile court retains greater authority; while in the latter situation, DSS has more authority regarding custody matters.

Furthermore, *In re Robert A.* concerns dependency proceedings before the termination of parental rights; a time when the juvenile court has the express statutory authority to determine whether an out-of-home placement must be made (§§ 361, 361.2), and when DSS, as an adversary of the parents in the dependency proceedings, is subject to greater supervision and control by the juvenile court. Thus, viewed in its appropriate context, the italicized language in *In re Robert A.* is of no assistance to CASA.

The minors assert "[s]ection 361.3 clearly provides that not only is the juvenile court authorized to make placement decisions for children in post-termination of parental rights situations where the permanent plan is one of adoption, but the court is obliged to do so where relative placement is being considered."

Section 361.3, subdivision (a) provides that, where a child is removed from the physical custody of his or her parents pursuant to section 361, preferential consideration shall be given to placement of the child with a relative if requested. In determining whether placement with a relative is appropriate, the county social worker and court are directed to consider various factors including: "Placement of siblings and half-siblings in the same home, if such a placement is found to be in the best interest of each of the children." (§ 361.3, subd. (a)(4).)

Section 361.3, subdivisions (d) and (e), upon which the minors rely, provide: "(d) Subsequent to the hearing conducted pursuant to Section 358, whenever a new placement of the minor must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the minor's reunification or permanent plan requirements. In addition to the factors described in subdivision (a), the county social worker shall consider whether the relative has established and maintained a relationship with the minor. [¶] (e) If the court does not place the child with a relative who has been considered for placement pursuant to this section, the court shall state for the record the reasons placement with that relative was denied."

We presume the minors understand that section 361.3 is not directly applicable because it concerns new placements of minors with adult relatives (§ 361.3, subd. (c)(2)) who will be caretakers for the minors, not placements in the foster home of a nonrelative where relatives such as young siblings

reside. Rather, we interpret their contention to be (1) an inference may be drawn from subdivision (d) that section 361.3 applies to all new placement decisions, even for minors who have progressed to the permanent plan stage of dependency proceedings, and (2) subdivision (e) indicates the court has the authority to make placement decisions, hence the court retains the authority to direct the placement of minors who have a permanent plan of adoption.

The minors appear to believe that *In re Sarah S.* (1996) 43 Cal.App.4th 274 [50 Cal.Rptr.2d 503] supports their position. They are mistaken as *In re Sarah S.* stated: "By its own terms, . . . section 361.3 applies when 'a child is removed from the physical custody of his or her parents' and thus must be 'placed' in a temporary home, not when reunification efforts have failed and a permanent plan for adoption has been approved (or when a child has otherwise been freed for adoption)." (*Id.*, at p. 284.)

We agree with *In re Sarah S.* that section 361.3 does not apply when a child has been freed for adoption and DSS or a licensed adoption agency has the exclusive care and control of the minor pursuant to section 366.26, subdivision (j). "[S]tatutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) Harmonizing sections 366.26, subdivision (j) and 361.3, subdivisions (d) and (e), it is apparent that the permanent plan referred to in section 361.3, subdivision (d) is a permanent plan other than adoption.

The minors also rely on *In re Stephanie M., supra*, 7 Cal.4th 295, in which the Supreme Court assumed, without deciding, that section 361.3 applies at the permanency planning stage after the termination of reunification services but before the termination of parental rights. (7 Cal.4th at pp. 306, 308, 319-320.) Nothing in *In re Stephanie M.* holds, intimates, or addresses whether section 361.3 applies after a child is freed for adoption. Accordingly, the minors' reliance on this case is unavailing, as cases are not authority for propositions not considered therein. (*Isbell* v. *County of Sonoma* (1978) 21 Cal.3d 61, 73 [145 Cal.Rptr. 368, 577 P.2d 188].)

### III

■ The record discloses that, rather than review DSS's placement of the minors with the Culvers under the appropriate abuse of discretion standard, the trial court erroneously exercised its independent judgment to "veto" DSS's decision and "tell [DSS] what to do." There is no evidence that DSS

acted arbitrarily or capriciously in choosing the Culvers' home rather than the Stocktons' residence for interim foster case placement; and substantial evidence supports DSS's decision.

DSS stated sound reasons for selecting the Culvers, with whom DSS had worked before and knew could provide the type of special care that Theodore and Katelin needed. The Culvers were a good interim placement choice because in the past they successfully had transitioned children into eventual adoptive placements. Furthermore, Theodore needed an emotionally neutral environment in which to stabilize his behavior, away from the demands and expectations of Jasmine and Sacha, who desperately wanted to recreate their family unit.

DSS did not abuse its discretion in discounting Williams's opinion regarding the suitability of the Stockton home, since she was not sufficiently familiar with Theodore and Katelin to render an opinion regarding their best interests and she previously had made unsuccessful suggestions regarding potential adoptive placements. In any event, DSS was not ruling out the placement of Theodore and Katelin with their siblings at the Stocktons'; but in light of the Stocktons' desire to adopt the children, and recognizing the emotional trauma that would ensue to all four of the children if adoptive placement did not materialize and the siblings had to be separated once again, DSS was proceeding cautiously. Its decision to obtain an adoptive home study to ensure adoptive placement was possible before putting Theodore and Katelin in the Stocktons' home is not unreasonable. Unless adoptive placement of Theodore and Katelin with the Stocktons was a probability, placing them in the home would give Jasmine and Sacha a false impression that their family was reunited, only to have it torn asunder once again. Under the circumstances, DSS's decision to maintain sibling contact via visitation until it could determine the long term suitability of the Stockton home was appropriate.

The four concerns expressed by the juvenile court in its statement of decision do not establish an abuse of discretion by DSS concerning the placement of the minors. The fact DSS reevaluated the Bringle placement, and decided it would not work after the Bringles requested respite care, demonstrates that DSS was attuned to the minors' best interests. The same is true of DSS's reassessment of the appropriateness of visitation with the siblings. Had DSS been blindly engaged in a power struggle, it would have kept the minors in the Bringle home and continued to oppose visitation in accordance with its prior views expressed to the court.

Why the court faulted DSS for moving the minors to the Culver home is perplexing. The Bringle placement was not working and the Herringtons,

who were providing respite care to Katelin, were leaving on vacation. Hence, the minors had to be placed elsewhere. The court was aware that DSS was considering the Culver home and specifically stated DSS could place the minors with whoever DSS thought was appropriate, including the Culvers.

As to the court's concern that the tenor of DSS's referral letter for a home study of the Stockton residence went well beyond a mere request for an impartial study, our review of the letter discloses otherwise. When referring a family for an adoptive home study, it is appropriate to point out areas of concern which need to be evaluated to ensure that adoptive placement in the home is in the minor's best interest. To fail to do so would be an abuse of discretion.

## IV

Since the juvenile court used the wrong standard of review in assessing DSS's placement of the minors, and because the record shows DSS did not abuse its discretion in placing the minors, the court's order moving the minors from the placement selected by DSS to one selected by the court must be reversed.[7]

## DISPOSITION

The juvenile court's "Ruling Re Contested [Section] 388 Petition & Status Review Hearing" is reversed. The petition for writ of mandate is dismissed as moot. Having served its purpose, the alternative writ is discharged.

Puglia, P. J., and Blease, J., concurred.

---

[7]We are informed that, during the pendency of this appeal, the juvenile court ordered the minors to be removed from the Stocktons' home and put in a new temporary foster care placement, the propriety of which is not before us.