Filed 8/29/22 Leah E. v. Superior Court CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| LEAH E. et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF KERN COUNTY, <br><br> Respondent; <br><br> KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Real Party in Interest. | F084435 <br><br> (Super. Ct. No. JD105887-01) <br><br><br> **OPINION** |

-ooOoo-

## THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ. Christie Canales Norris, Judge.

Law Office of Steven L. Bynum and Steven L. Bynum for Petitioners.

No appearance for Respondent.

Margo A. Raison, County Counsel, and Elizabeth M. Giesick, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*] Before Poochigian, Acting P. J., Detjen, J. and Smith, J.

Petitioners, Leah E. and C.C., former prospective adoptive parents for now 17-year-old twins M.P. and L.P. and two-year-old Gregory P. bring this petition for an extraordinary writ under Welfare and Institutions Code section 366.28[1] challenging the juvenile court's finding that removing the children from their custody served the minors' best interests. (§ 366.26, subd. (n)(3)(B).) They contend the juvenile court erroneously admitted into evidence confidential recordings prohibited by Penal Code section 632 and the matter must be remanded for further proceedings without consideration of the recordings. We find no error in the juvenile court's ruling and deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

*Dependency Proceedings*

M.P. and L.P. were removed from their parents' custody in January 2019 along with their five siblings because of domestic violence, substance abuse and neglect. The siblings were placed in different homes. Two of the siblings, N.P. and C.P., were placed with petitioners within two months of their removal and subsequently adopted by them. The parents were provided reunification services but the mother did not comply and the father minimally complied. At the 12-month review hearing in March 2020, the juvenile court terminated reunification services and set a section 366.26 hearing. In August 2020, the court ordered M.P. and L.P. into foster care with a permanent plan goal of placement with a fit and willing relative. By October 2020, M.P. and L.P. were placed with petitioners, who decided to adopt them. At a section 366.26 hearing in July 2021, the court terminated parental rights as to M.P. and L.P.

Meanwhile, Gregory was born in May 2020 and taken into protective custody at the hospital. That same month, he was placed with petitioners. In July 2020, the juvenile court exercised its jurisdiction over Gregory and denied the parents reunification services.

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

As petitioners wanted to adopt Gregory as well, the court terminated parental rights in August 2021 and selected a permanent plan of adoption.

Petitioners are an unmarried couple who at the time of these proceedings had eight children in their care, including M.P., L.P. and Gregory. Leah was a social worker with experience in family reunification, family maintenance and emergency response. Gregory is developmentally delayed in fine motor skills and gross motor development. He could not walk or speak and was being evaluated for autism.

*Referrals for Physical Abuse and General Neglect*

On September 21, 2021, a child protective services referral was generated regarding physical abuse by Leah and was investigated by the resource family approval (RFA) unit. It was alleged that Leah yanked Gregory by the arm out of his playpen and swatted him on his bottom. The video was taken by J.L. while she was filming herself practicing lines when Leah walked into the room. The video shows Leah pulling Gregory by the arm in an upward motion, swatting him and then putting him back roughly into the playpen. Leah was also heard scolding Gregory, who was only making typical infant babbling noises. The video was attached to the referral, which was substantiated by the RFA unit for physical abuse.

A social worker from the "Kern County Adoption Agency" (agency) met in private at petitioners' home with J.L., one of the children in their care. J.L. reported " 'they' had threatened her and she was afraid." She could not verbalize who " 'they' " were, though asked repeatedly. She would not say if the threats came from the other foster children or Leah. She denied that anyone hurt her, pushed her, hit her or was verbally or physically aggressive toward her. Her fear was being beat up and although no one had done so, they threatened her. She did not want to spend another night in the home and said Gregory should have been picked up a long time ago.

Leah demanded to know if there was a referral for an investigation. She said she was giving a seven-day placement notice if there was a referral or she would take J.L. to

3.

the emergency shelter because she did not want a referral to jeopardize the adoption of " 'the baby.' " She would not be able to protect J.L. from being beaten up by her adoptive daughter if there was a referral. J.L. was removed from petitioners' home because she was at imminent risk.

A referral was generated against Leah for general neglect involving J.L. J.L. recorded an incident, which was provided with the referral, in which Leah and her 15-year-old adopted daughter, R.E.,[2] are heard threatening J.L. The conversation was transcribed in full as follows:

> "[Leah]: Cus if I find out you're lying … I can't protect you. From them. I can't. I won't. Just know that.
>
> "[J.L.]: I didn't do anything.
>
> "[Leah]: Okay Imma believe you for right now, but if an investigator shows up and there's any kinda of bull sh[**]s that comes from this, cus I don't care if you talk to your social worker, talk to the social worker. Don't try to take us down with you. That's the difference[,] you know that right. Cus you get an investigation it delays my babies' adoption. You get an investigation it delays the twins adoption. That is you taking us down with you. That's the difference. I am just gonna tell you, I will not protect you if an investigator shows up. From them, from her, the twins, none of them … I will not protect you.
>
> "[R.E.]: Cus did you not hear that I beat the f[***] out of both of twins together. They were both on top of me and I flipped them both over and started beating the f[***] out of them. So that does not make me scared of you whats so ever. Don't f[***]en test me b[****] don't f[***]en test me.
>
> "[Leah]: [I]f I found out you're lying to me I will not protect you.
>
> "[R.E.]: I already warned you once about bringing sh[**] and drama into my family. Don't f[***]en do it again. I'm not f[***]en playing, … I am not.

---

[2]      R.E. is actually N.P. who was going by a new name.

"[Leah]: Cus the social workers said some sh[**] on the porch that's why I came in here to ask you like the f[***] [inaudible] … for two weeks. I have had no behavior from you or the kids and then this happens.

"[J.L.]: I didn't do anything wrong.

"[Leah]: I don't know whats gonna happen if you're removed from here. I don't know what you thinks is gonna happen. And youre talking about your aunt and uncle (inaudible) they want nothing to do with you. None of them do. Your grandpa will not even return the social worker email.

"[R.E.]: [Y]ou know whats gonna happen. If you get moved youre gonna go to f***en group home because you're really crazy.

"[Leah]: [B]ut the group homes are not in [K]ern [C]ounty. It's a different county.

"[R.E.]: They don't have any [in] Bakersfield.

"[Leah]: No only the prostitute group home.

"[R.E.]: Well I guess the b[****] is going to a prostitute group home.

"[Leah]: [S]he can't go there. She's not a prostitute shut the f[***] up.

"[R.E.]: [M]mm how do we know that.

"[Leah]: I do because she lived here that's how I know. I just need you to be honest because I need to be prepared for whatever hell you're bringing into my house.

"[J.L.]: I didn't do anything. I swear.

"[Leah]: [T]hen I believe you. But I'm just saying she was super weird on the porch about how concerned she is and whatever. If you say that, I believe you but if you change your mind and you want to tell me so I can be warned then I'd appreciate it."

After J.L. was removed, Leah demanded her cell phone and refused to release her personal items to her until the phone was turned over.

On October 20, 2021, the agency filed a notice of intent to remove M.P., L.P. and Gregory from petitioners' care. The agency attached a statement detailing the events leading up to the removal and the audio conversation. As a result of the audio

conversation, the agency was taking steps to decertify Leah and C.C. because Leah's "behavior [could] not be mitigated" and C.C. had not demonstrated that she would protect the children. In addition, Leah was no longer being cooperative with the agency and told the social worker, " 'Maybe my kids won't wanna … talk to you when you come.' " The children did refuse to talk to agency staff.

Petitioners objected to the children's removal and requested designation as their prospective adoptive parents.

The first review hearing of the children's permanent plan was scheduled for February 4, 2022. In its report for the hearing, the Kern County Department of Human Services (department) advised the juvenile court there were hearings scheduled to remove the children and rescind petitioners' foster care license. If their foster care license was not revoked and the children were ordered to remain in the home, the children would be adopted in May 2022.

On May 17, 2022, counsel for petitioners filed a motion objecting to the admission of video and audio recordings taken by J.L.[3] According to counsel, the parties participated in an administrative hearing in May 2022. During cross-examination, evidence was presented that Leah was not aware that J.L. was recording her and Leah did not consent to the videos. Counsel argued Penal Code section 632, subdivision (d) prohibited the admission of the video and audio recordings.

*The Removal Hearing*

The contested removal hearing was conducted over several sessions in May 2022. The juvenile court granted petitioners' request for prospective adoptive parent status and heard argument on petitioners' attorney's objection to admitting the video and audio

---

**3**    Counsel referred to the video and audio as "videos." The juvenile court later clarified that there was one video and one audio recording.

6.

recordings. The attorneys for the minors agreed the video and audio evidence should be excluded. The court overruled the objection and moved them into evidence.

Terrie Martinez, program director with the department, testified she was involved in the emergency response referral that came into the hotline. She received the video as a general neglect allegation. It was also reviewed for physical abuse. However, it did not rise to the level of physical abuse or general neglect and was not substantiated by the department. The audio recording was substantiated for general neglect. Martinez was concerned that there was a child threatened in the home and there was not anybody available or willing to protect her. The unwillingness to protect J.L. indicated Leah was not willing to protect Gregory. When Martinez heard the audio recording, she became concerned for all the children.

Hsin-Ling Isabel Liu was a social worker for the wraparound unit. As such, she was part of a team that worked with the family in the home. She did not have any concerns with the care the petitioners were providing for L.P. She was aware L.P. had been hospitalized for suicidal ideation in April 2022. L.P. stated she did not want to leave and was comfortable in her placement. Asked whether she believed it would be detrimental to remove L.P. from her placement, Liu said any movement could be very traumatic for a child. She did not have any concerns about anything related to Gregory.

R.E. felt safe in petitioners' home. She was not abused and never saw anything petitioners did with Gregory that concerned her. She had no intention of following through on her threats to J.L. Leah had told her more than once she could not be physical with any of the children. She did not beat up her sisters, M.P. and L.P., and had never seen petitioners abuse them. She believed Leah would step in to protect them if necessary.

M.P. felt safe with petitioners. They had never physically disciplined her or the other children and she felt safe. She and R.E. got into an argument and R.E. pulled her

7.

hair. Petitioners were in the room and told them to stop. She believed petitioners would protect her if one of the other children attacked her or tried to beat her up.

C.C. was unaware that either incident occurred. If she witnessed Leah abusing the children, she would report it. She had been at home on disability leave since January 2022 and had not seen any abuse in the home. She did not believe Leah abused Gregory when she swatted him. She never noticed Gregory hurting in any way or have any unexplained injuries. She received eight hours of nonspecific training each year. She had never seen the children physically fight but if she did, she would stop it. She and Leah took in difficult children because they wanted to give them stability. They had two adopted children together and Leah had an 11-year-old adopted son who was not living in the home. He was sent to live out of state with family because he kissed C.C.'s three-year-old niece on the mouth and stated that she wanted it. They had seven children in the home, one with diagnosed special needs.

Leah testified the day she swatted Gregory she was trying to lay him down for a nap and he was yelling and not wanting to nap. She laid him down six or seven times and on the last time she swatted him on the bottom and laid him on a pillow. She did not know anyone else was there. She regretted doing it. She knew she was prohibited from spanking a foster child but she was three weeks from his adoption day and the "lines kind of [got] blurred." She considered him her baby. If he were to remain in her care, she would not physically discipline him. She had seen the twins fight with R.E. over a year before. She told them to stop and reported it to the social worker. Social workers expressed concerns about J.L. before she was placed with Leah; that she was aggressive and they were her 13th home and her fourth home in a month and a half. She was removed from the previous home for speaking about sexual content with children. Leah and C.C. did not give notice to remove J.L. because they believed a child deserved permanency even if they had behavioral problems.

8.

Leah told J.L. she would not protect her because she was upset about the possibility of losing the siblings. However, she would protect J.L. and if there was a fight between the children, she would intervene. She and C.C. were done fostering.

*The Court's Ruling*

The juvenile court found it was in the children's best interests to remove them from petitioners. The court stated,

> "When we look at each incident separately, they're isolated. They're not terribly alarming, but when you look at the totality of the circumstances and what the [c]ase [l]aw is directing the [c]ourt to do looking at the entire circumstances from the past up until today, this [c]ourt has serious concerns and doubt as to the safety of the minors when we have the swatting incident of Gregory, the threats that [Leah] allows—that makes and allows to be made by [R.E.] to [J.L.]. And in that threat, referencing a prior physical altercation that [R.E.] had with [M.P.], that in her testimony was more than just hair pulling, it amounted to them wrestling on the floor, it sounds like.

> "It is clear to this [c]ourt that [Leah] was not going to protect [J.L.] and could not protect [J.L.] from [R.E.]. It seems that [C.C.] does seem to take an inactive role when it comes to the care of her children. And there's no indication as to whether she appreciates the inappropriate nature of the discipline that [Leah] had used on Gregory, who is a nonverbal, delayed child.

> "It also was not clear to the [c]ourt, and the [c]ourt was not given a lot of confidence that [Leah] appreciates her own actions and the severity of her actions and the inappropriateness of her actions, or whether she has a general insight as to why her behaviors were inappropriate. It seems she regrets them because she got caught and because she's unable to adopt these children.

> "I believe the [d]epartment has met their burden by a preponderance of the evidence that it is not in the best interest of these children to remain in the home.

> "It is clear to this [c]ourt that, based on the actions of [Leah] after the video surfaced, her reactions, her aggressive nature, that these children are at risk of future harm and neglect and [the court] will order the removal of the children from the home at this time."

The juvenile court denied petitioners' attorney's request for a stay in order to file a writ.

## DISCUSSION

Once a dependent child is freed for adoption, the agency to which the child is referred for adoption is responsible for the child's custody and supervision. (*Department of Social Services v. Superior Court* (1997) 58 Cal.App.4th 721, 724.) As a general rule, an interim or adoptive placement may be terminated at the agency's discretion at any time before the petition for adoption is granted. (*Id.* at pp. 732–733.)

The Legislature has enacted additional safeguards for when an agency seeks to remove a child from the home of a prospective adoptive parent (PAP). Where a PAP objects to the child's removal, the agency must prove by a preponderance of the evidence that removal is in the child's best interest. (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 45.) The juvenile court must determine whether the proposed removal of the child from the home is in the child's best interest, "and *the child may not be removed from the home unless the court makes that finding.*" (*Ibid.*) "The concept of best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' [Citations.] A primary consideration in determining the child's best interest is the goal of assuring stability and continuity of care. [Citation.] This can occur only by considering all the evidence available to the court at the time the court makes its decision regarding removal of the child." (*State Dept. of Social Services v. Superior Court* (2008) 162 Cal.App.4th 273, 286–287.)

The juvenile court's decision to remove a child from a specific placement is reviewable by way of a petition for extraordinary writ. (§ 366.28, subd. (b)(1).) The determination of whether the proposed removal is in the child's best interest is committed to the sound discretion of the juvenile court, and its ruling will not be disturbed unless an abuse of discretion is clearly established. (See *In re Stephanie M.* (1994) 7 Cal.4th 295,

10.

318.) "But we must also review the juvenile court's finding that the change is in the minor's best interests to determine whether there is substantial evidence in the record to support it." (*In re M.M.* (2015) 235 Cal.App.4th 54, 64.) We defer to the juvenile court's assessment of witness credibility (*T.W. v. Superior Court*, *supra*, 203 Cal.App.4th at p. 47), and we review the record in the light most favorable to the trial court's findings. (*In re L.M.* (2019) 39 Cal.App.5th 898, 913.) " ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " (*Id.* at p. 914.) "We may not reweigh or express an independent judgment on the evidence." (*Ibid.*)

Here, the agency exercised its discretion to remove the children from petitioners' care based on Leah's rough handling of Gregory as depicted in the video and her recorded statement she would not protect J.L. from physical harm. The juvenile court relied on the recordings in deciding to remove the children from petitioners' custody.

Petitioners contend the recordings violate their right to privacy under Penal Code section 632 because Leah did not know she was being recorded. They should not have therefore been admitted into evidence. We disagree.

Penal Code section 632, subdivision (a) prohibits the recording of a confidential communication with the use of a recording device without the consent of all parties to the communication and imposes a fine and/or imprisonment for a violation of the statute. Subdivision (d) of Penal Code section 632 allows the use of the confidential recording only in an action or prosecution of section 632 and prohibits its use in any judicial, administrative, legislative, or other proceeding.

The juvenile court admitted the recordings, reasoning that Leah impliedly consented to the video recording because J.L. was recording when Leah entered the room. The court also extrapolated the reasoning of *People v. Suite* (1980) 101

11.

Cal.App.3d 680 to admit the audio recording.[4]  The court was not, however, required to consider the admissibility of the recording evidence because the exclusionary rule does not apply in dependency proceedings.  (*In re Christopher B.* (1978) 82 Cal.App.3d 608, 615.)  As the court in *Christopher B.* stated, " 'The application of the exclusionary rule, primarily in criminal cases, may be necessary to insure that the law enforcement officers observe the proscriptions of the Fourth Amendment.  However, we are mindful that just dispositions are frequently thwarted thereby and we see no necessity to extend the rule to the relatively few violations in child custody actions which are not criminal in nature.  The possibility that such an extension might result in the suffering or deprivation of innocent children is too high a price to pay for any slight additional deterrent effect.' " (*Ibid.*)

We find no error.

## DISPOSITION

The petition for extraordinary writ is denied.  This court's opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A) of the California Rules of Court.

---

[4]     The statute at issue in *Suite* was Penal Code section 633.5, which allows the recording of a conversation "for the purpose of obtaining evidence reasonably believed to relate to the commission … of … any felony involving violence against the person." (*People v. Suite*, *supra*, 101 Cal.App.3d at p. 689, italics omitted.)