[No. B145977. Second Dist., Div. Two. Nov. 28, 2001.]

In re HARRY N., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Plaintiff and Appellant, v.
MARIA N. et al., Defendants;
MANUEL P. et al., Movants and Appellants;
ROSA S. et al., Objectors and Respondents.

**COUNSEL**

Lloyd W. Pellman, County Counsel, and Judith A. German, Deputy County Counsel, for Plaintiff and Appellant.

Vincent W. Davis for Movants and Appellants.

Van Deusen, Youmans. & Walmsley and Robert R. Walmsley for Objectors and Respondents.

**OPINION**

**COOPER, J.\***—Harry N. (the Minor), born mid-January 1999, was declared a dependent of the juvenile court soon after his birth. He was born with symptoms of drug withdrawal; both parents had histories of drug abuse, and his father had a history of arrests and convictions for violent offenses. He is currently in the care of respondents, his foster parents, with whom he was placed virtually at birth and who wish to adopt him.

Both the Los Angeles County Department of Children and Family Services (the Department) and the Minor's paternal aunt and uncle appeal from

---

\*Presiding Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

orders of the juvenile court. Appellants all argued for placement with the paternal relatives, who live in Puerto Rico. The court ordered that the Minor remain with the foster parents and that the adoption by them be set for finalization.[1] The court also ordered that the Minor not be removed from the home of his foster family without prior court order. The Department's appeal is from the order after a hearing under Welfare and Institutions Code section 366.26.[2] Manuel and Aleida P., the paternal uncle and aunt who wish to adopt the Minor, appeal from the juvenile court's order denying their section 388 petition.

This appeal presents an unusual and difficult factual situation. As observed by the juvenile court, "the difficulty is unusual because we have two families who wish to take care of Harry for the rest of his life." At least as of the time the juvenile court's decision was made, both prospective adoptive families received excellent reviews and were considered by the juvenile court to be appropriate parental choices for the Minor. Although the juvenile court ultimately sided with the foster parents, who had cared for the Minor since he was days old, the court did not express the view that placement with the paternal relatives in Puerto Rico would have been an abuse of discretion by the Department. Indeed, in most of the dependency cases we see, placement with a loving, responsible, biologically related family would be a welcome alternative for children within the system. Had these relatives lived in California instead of in Puerto Rico, where there was a delay in the home study, it is likely the Minor would have been taken from the foster family and placed with them early in the process.

The legal question presented to us by the parties is whether the Department or the court has the right to determine the specific family in which a dependent child will be placed for adoption once parental rights have been terminated and whether there is a statutory preference for the caretaker family in the circumstances of the case at bench. We hold that, absent an abuse of discretion, the Department has been given the authority to place dependent children in an adoptive home following termination of parental rights. The statutory "preference" for the caretaker family is that their application shall be processed and, if satisfactory, the family study "shall be completed before the processing of the application of any other person . . ."

---

[1] Initially, the Department acknowledged that the foster mother had given the Minor excellent care and that there was no reason to believe she will act against his interests, but that the Minor's very best interests were to be placed with his caring and loving biological parents. By the time the reply briefs were filed, the Department was reporting that the foster parents had engaged in dangerous parenting practices and was not recommending them as adoptive parents.

[2] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

(§ 366.26, subd. (k)), not that the caretaker family will automatically become the adoptive parents, although that frequently occurs. We shall therefore reverse and remand the matter for further proceedings consistent with this opinion.

PROCEDURAL HISTORY AND STATEMENT OF FACTS

Within two weeks of the Minor's birth, the Department filed a section 300 dependency petition. The minor, who was transferred to a neonatal intensive care unit at one day old, was detained and placed with the S's. He had been born two months early, with a positive drug screen.[3]

On January 29, 1999, the court found a prima facie case for detaining the Minor; vested temporary placement and custody with the Department; and gave the Department the discretion to release the Minor to any appropriate relative.

The jurisdictional/dispositional hearing report for February 19, 1999, stated that Mother was born in Chicago but went to Puerto Rico with her parents as a young child. She met Father, a native of Puerto Rico, where relatives of both still live. The social worker opined that the foster mother "has the expertise to meet most of [the Minor's] emotional and physical needs at this time in her foster home."

On February 19, 1999, the juvenile court ordered the amended petition sustained in large part; declared the Minor a dependent of the court; and ordered family reunification services. Parents were to have visits not less than twice a week, and as often as could be arranged.[4]

A status review hearing report was prepared for August 6, 1999, when the Minor was six months old. The report stated that the foster parents "are providing excellent care and supervision for the Minor. They have provided him with a safe [and] stable home and environment" and the Minor "appears to be happy and thriving in his placement" and was bonding with the foster mother. In addition to the Minor, the foster parents cared for a biological daughter and an adopted daughter. According to the report, the Minor had been taken to many doctor visits, including in late July, when he stopped

---

[3]The parental rights of the Minor's mother (Mother) and father (Father) have been terminated, and they are not parties to this appeal. At the time of Minor's detention, Mother had an 11-year-old daughter living with the maternal grandmother in Puerto Rico. Father had three children living in San Pedro with their mother. By August 6, 1999, Mother had stopped visiting and reportedly told the foster mother "they are giving her the child."

[4]The foster mother was under the impression that the visits were limited to one hour once a week. So counsel requested more frequent visits.

breathing and became red and the foster mother reported reviving him with mouth-to-mouth resuscitation.[5]

The foster mother also reported that the Minor's parents had stopped visiting in late March. However, on July 7, 1999, the paternal grandmother called regarding taking custody of the grandchild. She made "numerous telephone calls" and arrived from Puerto Rico to visit with the Minor. The paternal grandmother and a paternal aunt and uncle all visited with the Minor on July 27, and the grandmother and uncle visited on July 29, 1999.

The foster mother had been contacted by the adoption unit in early July 1999. The adoption assessment dated July 16, 1999, recommended adoption by the current caretaker, who stated she and her husband loved the Minor "very much" and wanted to adopt him. The CSW's report also noted: "Additionally, Mrs. [P.], Minor's paternal grandmother, living in Puerto Rico arrived in Los Angeles the week of July 25, 1999 and had 2 visits with the Minor in a neutral setting. She continues to desire to receive the child."

The paternal grandmother and an aunt appeared at the hearing on August 6, 1999. Mother and Father also appeared. The court was informed that the "grandmother is here from Puerto Rico and would very much like the Minor placed with her." The court stated: "It does appear that the Department is evaluating through the D.I.F. referral the grandmother in Puerto Rico, and I certainly think that would be the most appropriate placement also. [¶] I am ordering that the Department make every effort to place this child through the D.I.F. placement unit in Puerto Rico as soon as possible, assuming that it is appropriate." Moreover, "If the child could not for any reason be placed with the paternal grandmother, then certainly the Department should be looking at [another paternal relative, who lives in Carson.][6] There is no reason with two relatives present that appear appropriate that this child should remain in foster care." The court specifically ordered the Department to evaluate the paternal grandmother in Puerto Rico "forthwith."[7]

Over parents' objections and after denial of their request for a hearing on the reasonableness of the reunification services, reunification services were

---

[5]The incident was said to have occurred on July 29. The foster mother took the baby to Dr. Takla on July 30 and reported the matter to the CSW (children's social worker) during her August 4 visit.

[6]That "aunt" was the girlfriend of father's brother. The court stated, "They may want to get married to be placement options."

[7]The initial order was for the evaluation to be "as soon as absolutely possible with discretion to place this child with her." When counsel pointed out that the grandmother had already contacted the Department, and the Department had discretion with placement with relatives "and nothing has happened," the court changed the order to evaluation "forthwith."

terminated. The court found the present placement was appropriate and ordered that the paternal grandmother first and then the paternal aunt be evaluated forthwith for placement. Moreover, the court decided that the Department had the discretion to release the Minor to any appropriate relative. The matter was continued for a permanent plan hearing scheduled for December 8, 1999.

By the time of the December 8, 1999, hearing, the Department recommended termination of parental rights and that the Department proceed with adoption planning.[8] The section 366.26 hearing report noted that the paternal grandmother had returned to Puerto Rico. The likelihood of adoption was reported to be "excellent" by either the paternal grandmother, paternal uncle, or foster mother. The grandmother, who was unknown to the Department before July 1999, planned to adopt the Minor.[9] She was "highly motivated in gaining custody and adoption" and stated the child "is of her blood, and needs to be in a family home, not a [stranger's] foster home." The grandmother had called frequently from Puerto Rico as to the status of the home study and transfer of the child to her custody. However, despite her calls to the Puerto Rican Children Services, the home study report from Puerto Rico had not yet been received, possibly due to the "frequent closure of government offices due to the large number of hurricanes."

The foster mother still wanted to adopt. The Minor was "happy when foster mother reentered the room" and there was "a good bonding" with the foster mother, who reported that the Minor continued to get sick regularly.

A different referee conducted the December 8, 1999, hearing. Mother and Father both appeared. The paternal grandmother and a paternal aunt were present. Counsel for the Minor asked for a continuance, stating that the report was not adequate for the section 366.26 hearing. She believed "there was a misunderstanding by the Department" regarding placement of the child in Puerto Rico and "it was not the intention of the court and, in fact, the code requires that preference by given to the current caretaker of the child. Those individuals do wish to adopt this child, and they must be considered first, under the code." Counsel for the Department agreed that a supplemental report was in order and stated "we did do an evaluation of the

---

[8]The Department also asked that the court deny any request from the Minor's attorney for the Minor to accompany his foster mother to Mexico, based "on the need for the child's availability for possible placement in Puerto Rico upon receipt of a report from International Placement. Additionally, the recommendation is based on Minor's fragile health."

[9]The grandmother was described as a 53-year-old Puerto Rican national, a divorced mother of six, with one adult son living with her. She is a nurse and works at a local hospital and has no criminal history. Another son would be willing to care for the Minor if for some reason the grandmother could not do so.

foster home and found that when we were recommending placement with the foster mother, it is just not contained in today's report." Because of the misunderstanding, the Department also asked the matter be put over for a supplemental report.

Counsel for Father asked that family "be given priority and especially in this case where tremendous efforts have already been made in that regard by the grandmother in Puerto Rico. She has tried to move mountains to make this happen and has been in regular contact with the Department here . . . ."

The Department was to continue evaluating the home of the grandmother in Puerto Rico, not place the Minor there, and was to prepare a report addressing the feasibility of adoption by the foster mother as well as the DIF (Desarrollo Infantil Familiar) update. The court ordered the Minor not to be moved absent prior order of the court unless there was an emergency. A request to approve a family vacation in Mexico with the foster parents was denied without prejudice to bringing in medical evidence that the trip would be appropriate.

On December 14, 1999, there was a walk-on request for the Minor to accompany the foster parents on a holiday visit to Mexico. A report was prepared on the feasibility of taking the Minor on vacation to Mexico. The Department recommended against the trip, given Minor's prior medical assessments and fragility, even though two doctors had cleared the travel.

Commissioner Losnick again presided on December 14, 1999. Grandmother was present. Over objection of the Department, Father, and Mother, the vacation request was granted.[10] The Department's request for a stay of the visit to Mexico was also denied. The court further ordered that the paternal grandmother could visit the Minor as often as possible while she was in Los Angeles.[11]

A supplemental section 366.26 report was prepared for February 1, 2000, when the Minor was 13 months old. There had been no participation by the parents, so termination of parental rights was recommended. The report indicated that, fortunately for the Minor, there were several prospective adoptive parents. The paternal grandmother had been "anticipating the placement of the Minor with her since her first contact with this CSW in July 1999 when the international placement referral was made."

[10]One objection to the trip was that the grandmother had traveled from Puerto Rico to see Minor and was trying to adopt the child, and the trip would interfere with her ability to visit him.

[11]Counsel for the father informed the court that the grandmother had had a visit the previous Friday and had tried to schedule another visit but the "foster mother apparently indicated that she couldn't do that until she had some kind of authorization from the court." The court replied: "Obviously, she's traveled a far distance, and to be able to see this child once would be [woefully] insufficient."

A paternal uncle, Manuel P. and his wife, Aleida, were also evaluated. They are the relatives who, along with the Department, are appellants in the matter before us. The uncle, 36 years old, has a bachelor's degree in criminal justice and has been employed for 11 years with the police in Puerto Rico. His wife was in the fourth year of criminal justice studies and has been employed as a secretary. They do not have a child and are both receptive to adopting the Minor. "They feel they can offer the Minor a home within his family Puerto Rican tradition. Also, they are resolved to raise the child within their union as they have no other children."

The DIF report on the paternal relatives was attached to the report but had not yet been translated. The court was informed that the report favored adoption with the paternal uncle "as he provides more resources, larger home and means to provide for the medical care for the minor." The CSW could not reach the uncle as the telephone had been disconnected.

Furthermore, the foster parents were evaluated. They are a licensed foster home. Mr. S., born in 1953, in Mexico, was the fifth of seven children; he attended school until the ninth grade in Mexico, attended an English training school in California, and was employed for 11 years as a missile assembly operator. Mrs. S., also born in Mexico, was the ninth of nine children and attended school until the 11th grade. They came from the same town, knew each other as youths, and married in Mexico when he was 24 and she was 23 years old. She stopped outside employment in 1992. Their natural children are a 21-year-old son and 15-year-old daughter, both of whom live at home and attend school. They adopted now five-year-old Carrie S. The family has bonded with the Minor "immensely" and has given him "more than adequate care and love." The siblings refer to the Minor, who has been in their home since he was two weeks old, as their brother.

A status review hearing report was prepared for the February 1, 2000, hearing. The Minor reportedly "continued to receive excellent care at the home of his foster parents." He "appeared to be happy and thriving in his placement." The trip to Mexico was cancelled "due to extended family problems and Mrs. [S.] breaking her big toe." A copy of the home study from Puerto Rico was received on January 14, 2000, in Spanish; it had not yet been translated.

The pediatric rehabilitation department at Miller Children's Hospital submitted a report based on a December 9, 1999, evaluation. The Minor was doing well, had made great progress, and his foster mother "appears very devoted to him . . . ."

At the hearing on February 1, 2000, the juvenile court terminated parental rights. Moreover, the court found it likely the Minor would be adopted. The court ordered that the Minor was not to be moved without prior order of the court and asked for a report for the next hearing to include the date of finalization of adoption hearing. Moreover, the court viewed a photograph of the Minor and stated he looked "quite healthy and happy to me. Though we were given information earlier in his life that he was frail, he does not appear to be frail in that picture." Father's counsel added, "I know that the court does not have the authority to choose the adoptive family, but for the record, it is Father's wish that his mother, the paternal grandmother, be the person to adopt this child."

Grandmother Maria P. in propria persona filed a section 388 petition on April 26, 2000. She sought to modify foster care "because he is my grandson and love him and I know I can take good care of him." Petitioner sought a hearing on the petition. The court denied the petition in that "parental rights have been terminated and petition fails to show a change of circumstances" and "on the ground that it does not appear that the best interests of the child(ren) may be promoted by the proposed change of order."

On about June 21, 2000, there was a walk-on request for curtailment of visits by the paternal grandmother and other parties. On May 30, 2000, counsel for the foster parents had written to the Department stating a social worker had visited the foster mother and "told her that the minor will most likely be moved to the home of his biological grandmother in Puerto Rico." On July 21, 2000, the court granted the walk-on request for modification of visits and, over the Department's objections, ordered there be no visits for any birth relatives for the child until the next hearing.

On August 1, 2000, the date for the next scheduled hearing, the foster parents filed a motion for de facto standing/status. The foster mother's declaration detailed her care for the Minor, her desire to pursue adoption, and the infrequency of visits by the paternal relatives. The Minor's pediatrician attested to the "strong emotional bond and affection" between the Minor and his foster mother and opined that separating the Minor from the foster family would be against his best interest and injurious and detrimental to the Minor's well-being and development.

The CSW's report for August 1, 2000, recommended the Minor be placed with the paternal uncle, Manuel P., and his wife, Aledia, and requested authorization for the Minor to accompany the paternal family to Puerto Rico.

The paternal relatives had visited twice in July 1999, once in August 1999, once in July 2000, and were scheduled for a visit on July 24, 2000.[12] The paternal uncle, his wife, and the grandmother traveled from Puerto Rico in May 2000, but a visit with the Minor was not arranged.

However, the report indicated that the Minor continued "to receive excellent care from his foster parents . . . and has a close relationship with the [foster] family." Moreover, the CSW observed the Minor "constantly hugging [the foster mother] during the home visits." He was still receiving weekly in-home physical therapy for development of his motor skills. Home studies were being completed for both the foster family and the paternal grandmother, uncle, and aunt, all of whom wanted to adopt the Minor. The aunt and uncle stated that "Harry's arrival to their home would be the best blessing." The foster mother stated she "loves Harry and wants to adopt him."

At the August 1, 2000, hearing, given the opposition to both motions, the court asked for response and reply briefs on the motions filed by the foster parents and the paternal uncle to be de facto parents. The paternal aunt, uncle and grandmother were permitted at least two visits with the Minor, with the foster parents and the social worker, if desired, present. The court specified that the child should be allowed to play and sit without coercion or cajoling. The matter was continued to September 18, 2000, for a hearing on the motions and to address Minor's placement.

The paternal uncle filed a section 388 petition on August 7, 2000. He declared that he and his wife wanted visitation with the Minor pending further hearing and wanted the Minor to visit in Puerto Rico. He and his wife were desirous of adopting the child but were informed the foster mother opposed the adoption.

The Department filed a brief stating it was not opposed to the de facto parental status motion of the foster parents or the section 388 motion filed by the paternal relatives. In addition, the Department sought an order permitting placement of the Minor with his paternal relatives for adoptive placement. As it does on appeal, citing section 366.26, subdivision (j), and *Department of Social Services v. Superior Court* (1997) 58 Cal.App.4th 721, 734-735 [68 Cal.Rptr.2d 239] (*Theodore D.*), the Department argued it has the authority to replace a child absent a showing that the Department has abused its

---

[12]During that visit, the Minor first clung to the foster mother. When the CSW accompanied the paternal relatives, without the foster mother, for a visit in a park, the Minor and paternal relatives, the CSW "observed the child and paternal family members taking pictures, playing together, and exhibiting affection via hugs and kisses. Toward the end of visit, the child Harry was [initiating] the kisses."

discretion. Furthermore, it argued that placement of the Minor with his paternal relatives, who had maintained constant contact and a request for adoption, served the Minor's best interests.

Minor's counsel argued that the Department's authority to place children for adoption is not absolute; that the Minor is bonded to his foster family, and the current placement is appropriate. Relying on section 366.26, subdivision (k), the Minor's counsel asked the court to order the Department to process the application of the foster parents to adopt the Minor.

The CSW's report for September 18, 2000, recommended that the Minor be placed with the paternal uncle and his wife. Furthermore, the Department requested authorization for the Minor to accompany the relatives to Puerto Rico, with a one-way airline ticket for the Minor. The paternal relatives had visited the Minor three times in August 2000.[13] Although there were some transportation problems, the visits "went well" and the paternal uncles, aunt and paternal grandmother "continued to demonstrate a commitment in adopting their relative child." The aunt is infertile, loves children, and this adoption "represents a dream come true for her and her husband, and possibly the only opportunity to become parents."

The report also stated that the Minor had been in the foster home since he was an infant and "has a close relationship with the [foster] family," who still wish to adopt him. The foster parents had provided the Minor "with a nurturing home environment." The foster mother stated she loves the Minor and wants to adopt him.

The foster parents and all the paternal relatives were present at the September 18, 2000, hearing. The court started "by indicating . . . this is probably one of the more difficult types of cases that this court has to decide. These are very delicate issues. The circumstances are unfortunate, frankly, in the way that the relatives found out about Harry and the fact that this child was placed with the [S.'s] early in his life."

The court granted the foster parents' de facto parent motion. The parties then argued the issue of placement, with the Department contending that, absent an abuse of discretion, where a child will be placed prior to adoption is "within the purview and exclusive control of the Department . . . ." Furthermore, it would not be an abuse of discretion to place the child with a

---

[13]The visits to Los Angeles since the Minor's birth have cost the parental relatives over $5,000 in travel expenses alone. The total trip takes more than 10 hours from Puerto Rico to Los Angeles, with seven and one-half hours on the airplane. This amount of money does not include the expenses to retain an attorney.

paternal aunt and uncle who have requested adoption from an early stage, have visited Los Angeles from Puerto Rico at their own expense to visit the boy, and through no fault of theirs but because of reasons beyond their control have been unable to claim custody of the Minor.

Counsel for the foster parents argued that concession of their de facto parent status admitted they are the psychological parents of the Minor and in effect conceded that any change in the current status "would necessarily be disruptive to Harry's life." While agreeing "in the abstract" that the abuse of discretion standard applied, counsel did not concede it was the only standard that applied. Instead, when the Legislature decided that following termination of parental rights the court was not to look from the standpoint of the parents, it also should not look from the standpoint of other relatives. Citing section 366.26, subdivision (k), counsel argued that the caretaker has a "head start" in the adoptive process and should be permitted that leg up as "the people who have demonstrated love, concern, compassion, daily care, control, and custody of that child." Furthermore, stating it was "unfortunate" the Department did not act quickly and the family members waited so that "so much time has passed," counsel argued it would be an abuse of authority to disrupt Harry's life from the only family he has known.

Counsel for the paternal aunt and uncle argued that they came forward over a year ago and have complied with everything the Department has asked them to do. For whatever reason, the Department did not get the Minor on the plane to Puerto Rico, but that was not the fault of the paternal relatives. The Minor has done well with the P.'s when he has been with him, and counsel offered to produce testimony about that relationship. Moreover, the paternal grandmother is also available to provide care.

Counsel for the Minor argued that the Department could have placed the Minor with the relative in Puerto Rico very easily early on but did not choose to do so. Such a placement could have been made when reunification services were terminated in mid-1999. In the meantime, the Minor continued to be in a home with good people who have cared for him. Finally, the issue was a legal one for the court, and section 366.26, subdivision (k), mandates a preference for the foster parents who have cared for the child.

The Department responded that the Department could not have placed the child with the paternal relatives until an Interstate Compact for Placement of Children was completed, which did not occur until January 2000, just prior

to the section 366.26 hearing where parental rights were terminated.[14] Moreover, there is a familial preference from the detention until the section 366.26 termination of parental rights, and then the Department has the exclusive control unless it is being arbitrary or capricious.

In explaining its decision, the court stated it had no reason to believe that either the foster parents or the paternal relatives "are not sincere, good, well-intentioned families, both of whom want to provide a stable environment and family for this child. [¶] [T]his case is not about whether the [S.'s] or the [P.'s] would be better parents. I will take it for granted that each of you . . . would be excellent parents. That's not what we're here for today." Moreover, had the paternal family known about the child, "they would have stepped forward even sooner. These are very unfortunate circumstances, frankly."

The court noted that one could not seriously argue that a child is not impacted from a change of placement at 18 months. The court agreed with the statutory interpretation that section 366.26, subdivision (k), indicates a preference for the caretakers. "There are innumerable good reasons for that. In this particular case the [foster parents] had this child placed with them at birth. They are the parents, as far as this child is concerned. The court does not see a reason why they couldn't adopt this child.

"The court did make an order at [the Minor's counsel's] suggestion over the Department's objection that the child not be moved without prior court order. I will, frankly, tell you, and I will through the record of the appellate court that the reason I make those orders not to move children without my further approval is the very nature of this case which is when children are moved from people who had them placed with them with the intention and hope and dream and support of adopting, and the Department moves the children to another placement, be it a relative or not a relative."

The section 388 petition filed August 7, 2000, was denied. In addition, the court ordered the Minor was not to be replaced into any other home or moved without prior court order from the home of the foster family. Adoption was to remain the plan. The court allowed visits with the paternal relatives in the days they would be in town and suggested that "should the adoption go forward, that the [relatives] get to be a part of the child's life." However, the court would not order the visits to be outside the presence of the foster parents. The report for the next hearing was to include the date set for finalization of adoption hearing.

---

[14]The court agreed.

The Department, which had filed a rehearing motion, withdrew that motion, stating the withdrawal was "not to be construed as a waiver of any and all appellate" or other rights. On November 14, 2000, the Department filed a notice of appeal from the juvenile court's "order of September 18, 2000." Represented by a new attorney, the paternal aunt and uncle filed a notice of appeal from the "denial of the 388 petition on Sept. 18, 2000."

*Postappeal proceedings in the juvenile court*

As referenced in the Department's reply brief and in its opposition to Minor's motion to dismiss the appeal and remand for further proceedings in the juvenile court, the Department filed a section 388 petition on June 6, 2001. Responding to the court's order of February 10, 2000, that the Minor not be moved without prior order of the court, the Department asked that that order be changed and that the Department should be allowed the discretion to suitably place the Minor with the paternal aunt and uncle as prospective adoptive parents. This request was made in light of the May 15, 2001, denial of the home study for the foster parents and the recommendation by the adoption staff that the Minor should be placed with his paternal aunt and uncle, with the goal of adoption.

According to the exhibits attached to the Department's papers, the foster parents were informed by letter that the Department was "unable to approve you as an adoptive applicant for the minor . . . based, on but not limited to the following information; you are not allowing this child to reach his developmental milestones. For example, after reviewing the case notes, there were recommendations made by the Regional Center when Harry was 23 months of age, that a pre-school program is needed for him to address his cognitive and language delays. You were not willing to follow the Regional Center recommendations, therefore the minor's delayed language skills and socialization skills have not been addressed."

In addition, though the Minor's "primary physician states that he is a normal healthy child," the Department was concerned that the Minor "had an excessive amount of medical appointments that resulted in many dosages of medicine and antibiotics. For example, during this first year of life, eight different doctors saw Harry at four different offices. While the majority of the visits were to Dr. Takla or his associates, doctors in South Gate and Montebello also saw Harry. Antibiotics were prescribed at least three times and he was seen in the Emergency Room twice, for a total of 25 visits. [¶] In Harry's second year of life, in a fourteen-month period, Harry was seen 31

times by Dr. Venegas and was taken to the Emergency Room five times. He was given antibiotics at least ten times. [¶] These were 33 visits in his 2nd year of life, five Emergency Room visits. The current total of medical appointment for Harry (who is only 27 months of age) has been at least 60 visits and 7 Emergency Room visits. The doctor is seeing Harry more frequently at this age, than when he was an infant."

The Department concluded from this pattern "that a number of Harry's illness or doctor's visits were exaggerated to prevent visits with his relatives. [¶] The above concerns raise questions as to whether or not your home is the best environment for this minor."

An ex parte application filed by the Department, dated May 30, 2001, outlined in detail the foster parents' alleged obstruction of visitation by the paternal aunt and uncle following a March 19, 2001, statement by the juvenile court giving the Department discretion to arrange such visits, including overnight visits. The CSW's interviews with the Minor's pediatrician, the hospital and the public health nurse were included. His pediatrician thought Puerto Rico "will be great for Harry" and was surprised at the medications given by other doctors and the length of the foster mother's administration of an antibiotic he had prescribed.[15]

Further, the foster mother had objected to further visitation with paternal siblings in San Pedro after a December 1999 visit, saying they "were too wild and that 'my home is not a kindergarten.'" Visits in April and May 2001 with those siblings went well when supervised by the paternal aunt and uncle.

There were several specific instances where the foster parents reportedly obstructed visits with the paternal relatives, one in which the foster father was "spitting mad" and shoved the child at the CSW. There were angry objections to an unannounced visit by the CSW, who saw that the Minor was healthy and relaxed despite reports by the foster family and their attorney that he was "becoming increasingly sick with each visit."

On May 18, 2001, the foster parents appealed the Department's decision to deny the adoptive home study and requested an immediate hearing. They argued that the CSW "was predetermined to deny the [S.'s] adoption home study."

---

[15]However, a letter from Dr. Venegas allegedly left out many of the details of their conversation.

CONTENTIONS ON APPEAL

The paternal aunt and uncle contend: 1. They have standing to appeal the denial of their section 388 petition since they are aggrieved by the court's decision.[16] 2. The court erred in denying placement with them since they had an approved home study and the Department recommended the Minor be placed with them. 3. Notwithstanding section 366.26, subdivision (k), the application of the foster parents is not required to be granted by the court merely because the child has lived in that home since birth.

The Department contends: 1. The juvenile court's only role should have been to review the Department's placement decision for an abuse of discretion. 2. The Minor may be placed with paternal uncle Manuel P. within the guidelines set forth in section 366.26, subdivision (k).

Respondent foster parents contend: 1. The juvenile court appropriately ordered that the Minor not be removed from his de facto parent placement. 2. The section 388 petition was properly denied. 3. Application of section 366.26, subdivision (j), to the extent it grants the Department complete discretion concerning a minor's placement without judicial oversight, is inconsistent with public policy and this state's expressed position that changes of placement should be avoided.

The Minor filed a letter brief and request for dismissal arguing that postbriefing occurrences, primarily the Department's denial of the foster family's home study for adoption and the juvenile court's consideration of a section 730 evaluation to address harm to Harry by a move from his family, make dismissal of the appeal and remand to conduct a hearing on the Minor's best interests would be preferable to considering this appeal.

The Department opposed the motion to dismiss and/or remand. As discussed above, in its opposition the Department attached the section 388

---

[16]Their standing is not contested by respondents to the extent that they are aggrieved by the denial of the section 388 petition. However, as respondents point out, their section 388 petition asked only that the court's order staying visitation be lifted and that the relatives be permitted a visit with the minor in Puerto Rico. There was no request for adoptive placement made in the section 388 petition from which the paternal relatives appeal. Given the visitation granted on September 18, 2000, respondents argue that the paternal relatives' appeal from the section 388 petition is "entirely without merit."

Furthermore, respondents argue that the Department is prevented from seeking review of the April 27, 2000, order denying the requested change of placement because, although a party aggrieved by that order, it neither petitioned for a writ or appealed the April order. (See *Adoption of Alexander S.* (1988) 44 Cal.3d 857, 866-868 [245 Cal.Rptr. 1, 750 P.2d 778].)

petition it filed June 6, 2001, and supporting papers. The superior court file, with which we have augmented the record on appeal, states that the motion was denied on June 12, 2001, the written order stating that "this matter and issue is currently before the court of appeals [*sic*]."[17]

This division denied the motion to dismiss and remand on June 20, 2001.[18]

## DISCUSSION

1. *Appellants have standing, and this appeal is not an impermissible collateral attack on the April 27, 2000, order.*

■     Preliminarily, respondents contend that the paternal aunt and uncle's section 388 petition, from the denial of which their appeal is taken, cannot properly seek review of the placement because the petition was more limited in its request. In addition, respondents argue that the Department's appeal is an impermissible collateral attack on the April 27, 2000, order and that the Department should not be able to seek review by appealing the September 18 order. Although the paternal relatives' appeal must be reviewed as a denial of a section 388 petition, many of the issues presented may be raised. In any event, the Department's appeal is timely and appropriate given the changing circumstances presented at each hearing in the juvenile court. (See § 395; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1250-1251 [98 Cal.Rptr.2d 844] [postdispositional orders are separately appealable and must be appealed within 60 days].)

2. *Interaction of the applicable statutes.*

■     In the case at bench, the Department recommended adoption by the Minor's paternal aunt and uncle in Puerto Rico. The court acknowledged that the paternal aunt and uncle were appropriate and made no findings as to

---

[17]In addition, the superior court file contains a section 730 evaluation conducted by a psychologist at the request of the juvenile court. The evaluation was filed August 2, 2001; and the matter was on that date continued until September 17, 2001.

[18]In response to the Minor's brief and in its reply brief, the Department produced new evidence that the foster parents "are seriously deficient caretakers." Among the more serious charges is the report that the foster parents mistreated other foster children in their care by leaving for vacation in Mexico and placing the children in the care of an unapproved relative, who beat the children. The same report stated inter alia that the foster parents blocked the Minor's visits with siblings and sabotaged attempts by the paternal aunt and uncle to visit the child.

whether the Department had abused its discretion in making its decision. Nevertheless, for reasons set forth above, the juvenile court ordered the Minor placed with his foster parents. The parties argue about the application of various statutes.

Appellants rely in large part on subdivision (j) of section 366.26, which provides: "(j) If the court, by order or judgment declares the child free from the custody and control of both parents, or one parent if the other does not have custody and control, the court shall at the same time order the child referred to the State Department of Social Services or a licensed adoption agency for adoptive placement by the agency. However, no petition for adoption may be granted until the appellate rights of the natural parents have been exhausted. The State Department of Social Services or licensed adoption agency *shall be responsible for the custody and supervision of the child and shall be entitled to the exclusive care and control of the child at all times until a petition for adoption is granted.* With the consent of the agency, the court may appoint a guardian of the child, who shall serve until the child is adopted." (Italics added.) Appellants point out that, had Manuel and Aledia P. lived in California, the Minor would likely have been placed with them long before the hearing in February 2000. (See § 361.3 [preference for placement with relative when child is removed from the physical custody of parents].)

Respondents rely heavily on subdivision (k) of section 366.26, which they contend affords foster parents a preference over all others who attempt to disturb that relationship. Subdivision (k) provides: "*Notwithstanding any other provision of law,* the application of any person who, as a relative caretaker *or foster parent, has cared for a dependent child for whom the court has approved a permanent plan for adoption,* or who has been freed for adoption, *shall be given preference* with respect to that child over all other applications for adoptive placement *if the agency making the placement determines that the child has substantial emotional ties to the relative caretaker or foster parent and removal from the relative caretaker or foster parent would be seriously detrimental to the child's emotional well-being.* [¶] As used in this subdivision, 'preference' means that the application shall be processed and, *if satisfactory,* the family study shall be completed before the processing of the application of any other person for the adoptive placement of the child." (Italics added.)[19] The statute gives the caretaker or foster parent preference in that "if satisfactory, the family study shall be completed

---

[19]Respondents also rely on Family Code section 8704, subdivision (b), in analyzing Welfare and Institution Code section 366.26, subdivision (j). However, Family Code section 8704, subdivision (b), applies only "[a]fter the adoption petition has been filed," at which

before the processing of the application of any other person for the adoptive placement of the child." (§ 366.26, subd. (k).) That language gives preference in time for processing the application but does not necessarily mandate that other applications will not also be considered.

Case authority supports appellants' view that, absent an abuse of discretion, the Legislature has given the power to the Department, not the court, to decide where a child should be placed after parental rights are terminated and pending adoption. (*Theodore D., supra,* 58 Cal.App.4th 721, 724-725, 733-734 ["Absent a showing that DSS's placement decision is patently absurd or unquestionably not in the minor's best interests, the court may not interfere and disapprove of the minor's placement."]; accord, *Los Angeles County Dept. of Children etc. Services v. Superior Court* (1998) 62 Cal.App.4th 1, 10-11 [72 Cal.Rptr.2d 369].)[20]

The court in *Theodore D., supra,* 58 Cal.App.4th 721, 736, distinguished *C.V.C. v. Superior Court* (1973) 29 Cal.App.3d 909, 918 [106 Cal.Rptr. 123], decided decades before under different statutes, and where the children were removed from the home of prospective adoptive parents, not the case in *Theodore D.* The court in *C.V.C., supra,* 29 Cal.App.3d 909, 918-919, concluded that prospective adoptive parents were entitled to a trial de novo in superior court before a child was removed from their home and were entitled to judicial review of the agency's decision using the independent judgment standard.

*In re Stephanie M., supra,* 7 Cal.4th 295, reversed a decision of the Court of Appeal which would have favored a Mexican grandmother over the child's foster parents. Our Supreme Court upheld the juvenile court's determination on the best interest of the child and held its determination should "not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.]" (*Id.* at p. 318.) The Department in *In re Stephanie M.* agreed with the placement decision of the juvenile court and along with the minor petitioned for review (*id.* at p. 302), so the Supreme Court did not need to discuss or decide the issue before us, where the Department and the

---

time "the department may remove the child from the prospective adoptive parents only with the approval of the court" and with supporting motion, notice, and affidavits. Subdivision (a) of Family Code section 8704 supports the Department's "*exclusive custody and control of the child until an order of adoption is granted*" and specifically recognizes the Department's discretion to terminate any placement. (See *Theodore D., supra,* 58 Cal.App.4th 721, 732-733.)

[20]Appellants concede that the court may overrule the Department's placement decision if it is patently absurd or unquestionably not in the minor's best interest. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 [27 Cal.Rptr.2d 595, 867 P.2d 706].)

juvenile court differ as to a placement decision. Similarly, in *In re Sarah S.* (1996) 43 Cal.App.4th 274, 279 [50 Cal.Rptr.2d 503], the Department and the juvenile court agreed that the proper placement was with the foster parents who had been caring for the child.[21] We agree with the line of cases that, absent an abuse of discretion, gives the Department authority for placement at this stage in the proceedings. The Department has been given the resources for investigation and evaluation of the placement decision. The juvenile court's role is to decide if there was an abuse of discretion in the decision.

Appellants argue there was no abuse of discretion in the Department's choice of adoptive parents for the Minor. (*In re Mark V.* (1986) 177 Cal.App.3d 754, 759 [225 Cal.Rptr. 460]; *Los Angeles County Dept. of Children etc. Services v. Superior Court, supra,* 62 Cal.App.4th 1, 10, 12.) To be sure, the juvenile court agreed that the paternal relatives would give the Minor a wonderful home. The Department argues that in such a case, where the Department's decision was not arbitrary, capricious or absurd, the juvenile court exceeded its own powers as limited by statutory and case law and its judgment should be overturned.

Respondents counter that the Department is statutorily and constitutionally limited in exercising its discretion to remove a child from a foster parents' home. (§ 366.26, subd. (k); see *C.V.C. v. Superior Court, supra,* 29 Cal.App.3d 909, 915-918.) [same court as later *Theodore D.*, 58 Cal.App.4th at pp. 724, 731-733].) Moreover, in choosing the paternal relatives instead of the foster parents, the respondents contend that, under the facts of this case, the Department abused its discretion, another ground for affirming the decision of the juvenile court.[22]

Given the applicable law, we must reverse the juvenile court's decision because it did not give the appropriate weight to the Department's recommendation. We remand for the juvenile court's consideration of whether the Department abused its discretion in making the recommendation. However, significant time has elapsed and circumstances may well have changed in

---

[21]The court in *In re Sarah S., supra,* 43 Cal.App.4th 274, 276-277, without discussing section 366.26, subdivision (j), held that section 361.3 "does not apply to a placement made as part of a permanent plan for adoption. Once the juvenile court determines that reunification efforts have failed, the only statutory preference in the adoption process is for a 'relative caretaker or foster parent' as provided in subdivision (k) of section 366.26." Because the Department and the court agreed on placement, there was no need to discuss subdivision (j).

[22]Both sides argue that their position is in the child's best interest, which must always be considered. (*In re Sarah S., supra,* 43 Cal.App.4th 274, 511, fn. 13; *In re Stephanie M., supra,* 7 Cal.4th 295, 320.)

either or both families seeking to adopt the Minor and perhaps even in the Department's recommendation in light of any changing events. We, like all the parties to this appeal, are most concerned with the best interests of the Minor, a child loved by two families, only one of which can adopt him.

We shall therefore reverse and remand for further proceedings in the juvenile court. In reviewing the decision of the Department, the juvenile court may consider circumstances that have arisen following the filing of this appeal.

## DISPOSITION

The orders appealed from are reversed, and the matter is remanded for further proceedings consistent with this opinion.

Boren, P. J., and Nott, J., concurred.